IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MADELANE RODRIGUEZ LONDRES | § § | |
| v. | § § | NO.  SA-13-CA-201-XR |
| MIGUEL ANGEL GONZALEZ MATEO | § § § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      Before the Court is Petitioner Madelane Rodriguez Londres's verified Petition for Return of Child (Doc. 1).  The Court held hearings on March 20, 2013 and April 19, 2013, at which the testimony of Petitioner and Respondent and various witnesses was heard.

**Findings of Fact**

1. Petitioner and Respondent are the parents of L.M.G.R.  L.M.G.R. was born in Bad Durkheim, Germany on October 14, 2004.  L.M.G.R. lived in Germany from birth until July 31, 2012.  Although she was born in Germany, L.M.G.R. is a citizen of the United States.

2. Petitioner and Respondent were never married.  Petitioner and Respondent separated from each other in November 2006.  Respondent returned to the United States in 2008.

3. Petitioner Madelane Rodriguez Londres is a citizen of Cuba, but has legally resided in Germany since prior to 2002.  Petitioner has rights of custody pursuant to German law.  Petitioner was exercising her rights of custody immediately prior to L.M.G.R. traveling to the United States.

4. Respondent is a citizen of the United States.

5. On or about July 18, 2012, Petitioner and Respondent agreed to allow L.M.G.R. to travel to the United States to visit her father and family members for the period July 31, 2012 through August 31, 2012.  Respondent agreed to return the child to Germany, purchased a round trip ticket, and otherwise agreed to coordinate with Petitioner should any different travel plans occur.

6. On or about August 30, 2012, Respondent notified Petitioner that he was not going to return the child to Germany.  Respondent has never returned the child to Germany.  Petitioner has not consented or acquiesced to the child remaining in the United States.

7. On September 25, 2012, the District Youth and Social Welfare Office for Bad Durkheim issued a notice stating that as of that date "no declarations of parental custody [for L.M.G.R.] according to Section 1626a Para. 1 No. 1 BGB have been registered." The notice further opines that inasmuch as there are no declarations of parental custody, the mother has the sole custody under German law, unless the parents marry each other or another regulation for the parental care has been made by the Family Court.

8. On or about November 30, 2012, Petitioner filed an application for return of the child with the German Central Authority. See Doc. 1.

9. On March 13, 2013, Petitioner filed her Verified Petition in this Court.

10. The United States and the Republic of Germany are contracting states as defined under the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Hague Convention").

11. The Republic of Germany was the child's country of habitual residence prior to July 31, 2012.

12. The child is currently physically located in the Western District of Texas, San Antonio Division.

13. Pursuant to Article 13 of the Hague Convention, Respondent has established by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

14. On or about November 23, 2011, the German Police, a U.S. Army CID staff member and a U.S. Military Police Officer investigated the death of L.M.G.R.'s sister (K.K.P.R.). Petitioner and another U.S. serviceman were the parents of K.K.P.R. Petitioner had placed a barbecue pit inside her Bad Durkheim home apparently for heating and K.K.P.R. died from smoke inhalation. The Petitioner was investigated by local authorities, but the death was ruled accidental and Petitioner was found not criminally responsible.

15. L.M.G.R. was inside the home on November 23, 2011. She has recounted to her therapist witnessing her mother's reaction to the death. L.M.G.R. also relayed that she had difficulty breathing because of the smoke inhalation, that her eyes were hurting and that she was vomiting. L.M.G.R. continues to express fears that she could have also died. She has also expressed anxiety or guilt because she did not prevent her sister's death.

16. L.M.G.R. did not inform her father about the November 23, 2011 incident until days before she was scheduled to return to Germany. About three days prior to her return flight, L.M.G.R. was found in her father's bathroom crying. She told her father that she

      did not want to return to Germany, that she sometimes was required to sleep on the floor of a Subway sandwich shop, that she would sleep in the same bed with her mother and mother's boyfriends, that she was left alone for long periods of time, that her mother told her not to tell her father about the death of her sister, and that she was not allowed to talk about her sister.  L.M.G.R. also told her father that she had a "lot of secrets inside of her."

17. On one occasion L.M.G.R. asked her father whether he and his live-in girlfriend/common law wife were "doing things that grownups do."  At that time Respondent became aware that L.M.G.R. actually had witnessed her mother having sex with at least one man.  On another occasion, Respondent testified that L.M.G.R. entered his bedroom in the middle of the night because L.M.G.R. wanted to ensure that she was not alone.

18. L.M.G.R. was referred to a therapist for evaluation.  Dina Trevino, Ph.D., a Licensed Psychologist, initially saw L.M.G.R. on January 16, 2013.  During the second visit with the child, L.M.G.R. relayed that her baby sister died when she was living in Germany.  During the course of nine other visits, L.M.G.R. stated that her mother told her that she should not talk about the baby.  L.M.G.R. also relayed that she took care of the baby.  L.M.G.R. also reported that when she lived in Germany, she sometimes had to sleep at a Subway store.  Finally, L.M.G.R. reported that in her usual residence in Germany, she slept in a bed with her mother and her mother's boyfriend.

19. Dr. Trevino noted that L.M.G.R. was suffering from anxiety, and that L.M.G.R. was reluctant to discuss her issues.  L.M.G.R. disclosed that her mother used to hit her with her sandals, and that she witnessed her mother on top of a man while they engaged in sexual intercourse.  L.M.G.R. also referenced her mother sleeping with a man at the Subway restaurant.  In addition, L.M.G.R. stated that her mother's male friends would hug her, but that made her feel uncomfortable.  Finally, Dr. Trevino's notes reflect that L.M.G.R. did not want to return to Germany and believed that her mother would hit her again.

20. During the April 19, 2013 hearing Dr. Trevino testified that L.M.G.R. was suffering from post traumatic stress disorder.  Dr. Trevino testified that L.M.G.R. has nightmares, is fearful and has thoughts of dying.  Dr. Trevino testified that it is certain that L.M.G.R. has witnessed one sexual act, but may have witnessed two or three other acts involving her mother.  Dr. Trevino expressed concern that L.M.G.R. may have been left unattended with other men at the Subway sandwich shop.  Dr. Trevino testified that L.M.G.R.'s exposure to sex at this age could also lead her to engage in similar behavior at an inappropriate age.  Dr. Trevino further expressed concern that there is a "very immediate risk of [L.M.G.R.] being molested herself" when left unsupervised.  Dr. Trevino testified that the "sexual risk for [L.M.G.R.] is very, very serious."  Dr. Trevino is also "very concerned about sexual molestation for this child and [thinks] that some of it may have occurred that she doesn't have the words to say."  L.M.G.R. "Freezes up" when asked to talk about this subject.  Dr. Trevino testified that it was her professional opinion that

        L.M.G.R. would be in immediate danger if she was returned to Germany.

21. Although Petitioner denies many of the incidents described above, the Court finds that Petitioner oftentimes provided inconsistent answers. The Court finds that Respondent, Patricia Ann Patton, Dr. Trevino and L.M.G.R. were more credible witnesses. For example, although Petitioner initially denied that L.M.G.R. witnessed her engage in a sex act with a man, she later conceded that it could have been possible, but inadvertent. Likewise, when initially asked whether she had ever slept at the Subway sandwich shop, she claimed that occurred after her daughter was living in Texas. She, however, later conceded that she had slept there with her daughter and that her boyfriend, the manager of the store, also spent the night.

22. At the request of the Respondent, and no objection raised by Petitioner, the Court interviewed L.M.G.R. L.M.G.R. relayed that she slept at the Subway shop on weekends and that two mattresses had been placed on the floor. With regards to her deceased sister, L.M.G.R. relayed that she had to take care of her little sister and gave her milk and changed her diapers because her mother would leave.

23. Respondent has failed to establish that Article 20 is applicable.

24. Even applying the Article 13 exception, a federal court has "and should use when appropriate" the discretion to return a child to his or her place of habitual residence "if return would further the aims of the Convention." In this case, however, L.M.G.R. is a United States citizen and has no relatives living in Germany with the exception of the mother and her stepbrother (who is living with his natural father). In addition, Petitioner is not a citizen of Germany. Accordingly, the Court declines to exercise its discretion to return L.M.G.R. to Germany.

## Analysis

**The Hague Convention, generally**

     This case arises under the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"), Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11. The Convention seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Art. 1, Treaty Doc., at 7.

     The Convention provides that a child abducted in violation of "rights of custody" must be returned to the child's country of habitual residence, unless certain exceptions apply. *Abbott v. Abbott*, 130 S. Ct. 1983, 1987 (2010). The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the

country of habitual residence. *Id.* at 1995. Ordering a return remedy does not alter the existing allocation of custody rights, but does allow the courts of the home country to decide what is in the child's best interests. *Id.*

As explained by the Supreme Court in *Abbot*, 130 S. Ct. at 1989 (citations omitted):

The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must "order the return of the child forthwith," unless certain exceptions apply. A removal is "wrongful" where the child was removed in violation of "rights of custody." The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence. The Convention also recognizes "rights of access," but offers no return remedy for a breach of those rights.

The United States is a contracting state to the Convention, and Congress has implemented its provisions through the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, 42 U.S.C. §§ 11601 *et seq.* The statute authorizes a person who seeks a child's return to file a petition in state or federal court, and instructs that the court "shall decide the case in accordance with the Convention." 42 U.S.C. §§ 11603(a), (b), (d). Suit should be filed in a court in the jurisdiction where the child is physically located. 42 U.S.C. § 11603(b). If the child in question has been "wrongfully removed or retained within the meaning of the Convention," the child shall be "promptly returned," unless an exception is applicable. 42 U.S.C. § 11601(a)(4).

**Existence of other custody proceedings**

"For purposes of the Convention, it is irrelevant whether there is a custody dispute concerning that child pending at the time of removal." *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004); *see also Abbott*, 130 S. Ct. at 1988 (noting that divorce/custody suit remained pending in state court).

If there is a pending state court action which is attempting to litigate custody, Article 16 of the Convention provides that the state court action "shall not decide the merits of rights of custody until it has been determined that the child is not to be returned" under the Convention.

"Children who otherwise fall within the scope of the Convention are not automatically removed from its protections by virtue of a judicial decision awarding custody to the wrongdoer. This is true whether the decision as to custody was made, or is entitled to recognition, in the State to which the child has been taken. Under Article 17 that State cannot refuse to return a child solely on the basis of a court order awarding custody to the alleged wrongdoer made by one of its

own courts or by the courts of another country.  This provision is intended to ensure, *inter alia*, that the Convention takes precedence over decrees made in favor of abductors before the court had notice of the wrongful removal or retention."   Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10503-10506 (1986) (hereinafter Convention Analysis).

The Convention is designed to restore the pre-abduction status quo.  *Sealed v. Sealed*, 394 F.3d 338, 344 (5th Cir. 2004).  The Convention is not concerned with establishing the person to whom custody of the child will belong at some point in the future; it seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about by the unilateral action by one of the parties.  *Id.* (quoting Explanatory Report to the Convention ¶ 71, at 447-48).  To this end, the Convention prohibits courts in countries other than that of the child's habitual residence from adjudicating the merits of the underlying custody dispute.  *Id.*

**Hague Convention provisions**

Article 3 of the Convention states: The removal or the retention of the child is to be considered wrongful where–

> *a* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> *b* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph *a* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Article 5 of the Convention states: For the purposes of this Convention-

> *a* "rights of custody" shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;
>
> *b* "rights of access" shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

Article 12 of the Convention states: Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority

concerned shall order the return of the child forthwith.

Article 13 provides: Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that –

> *a* the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or
>
> *b* there is a grave risk that his or her return would expose the child to psychical or psychological harm or otherwise place the child in an intolerable situation.
>
> The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.
>
> In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

Article 20 provides that "[t]he return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."

**Petitioner's case**

The parent seeking return of the child must prove that the child's removal or retention was wrongful within the meaning of the Convention by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1)(A). A parent wrongfully removes a child when he or she removes or retains the child outside the child's country of habitual residence, and this removal: breaches the rights of custody accorded to the other parent under the laws of that country; and, at the time of removal, the non-removing parent was exercising those custody rights. Convention, art. 3. *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004); *see also Abbott*, 130 S. Ct. at 1990 (a child is "wrongfully removed" if he was removed in violation of a right of custody).

country of habitual residence

Neither the Convention nor ICARA define "habitual residence." A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective. *Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp. 2d 828, 842 (S.D. Tex. 2006)

(citing *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)).

### rights of custody

The Convention recognizes that custody rights can be decreed jointly or alone, and defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbott*, 130 S. Ct. at 1990. The phrase "place of residence" encompasses the child's country of residence. *Id.* The right to choose the child's country of residence is a right "relating to the care of the person of the child." *Id.* at 1991.

Pursuant to Article 3 of the Convention, rights of custody may arise from operation of law, from a judicial or administrative decision, or from a legally binding agreement.

When no formal custody agreement exists between the parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had "rights of custody" within the meaning of the Convention. *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004). Children who are wrongfully removed or retained prior to the entry of a custody order are protected by the Convention; there need not be a custody order in effect to invoke the Convention's return provisions. Department of State Guidance, 51 Fed. Reg. 10494.

### exercise of rights of custody

The Convention protects rights of custody when "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Abbott*, 130 S. Ct. at 1991. The petitioner must allege that he or she actually exercised his or her custody rights at the time of the breach or would have exercised them but for the breach.

The determination whether a party is exercising custody rights closely parallels the determination of the nature and dimension of those rights. *Sealed v. Sealed*, 394 F.3d 338, 344 (5th Cir. 2004). Courts charged with deciding "exercise" under the Convention must not cross the line into consideration of the underlying custody dispute. *Id.* To avoid this possibility, American courts interpret "exercise" broadly, and thus, in the absence of a ruling from a court in the country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes "exercise" of those rights." *Id.* at 345. "To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child." *Id.*

**Respondent's case**

Even if the child has been wrongfully removed, a return order is not automatic. Return is not required if the abducting parent can establish that a Convention exception applies. *Abbott*,

8

130 S. Ct. at 1997.  If a petitioner shows by a preponderance of the evidence that the removal or the retention of the child was wrongful, *see* 42 U.S.C. § 11603(e)(1), the burden shifts to a respondent to prove an applicable affirmative defense.   Several such defenses are available if a respondent "opposes the return of the child." 42 U.S.C. § 11603(e)(2).

A respondent may show by clear and convincing evidence that there is a "grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b); *see* 42 U.S.C. § 11603(e)(2)(A).

A respondent may show by clear and convincing evidence that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20; see 42 U.S.C. § 11603(e)(2)(A).

<u>grave risk of physical or psychological harm</u>

Article 13(b) provides an exception to return in the event of a "grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."   A party opposing a child's return must prove the existence of a grave risk by clear and convincing evidence.  42 U.S.C. § 11603(e)(2)(A).

Even if this "narrow" exception applies, a federal court has "and should use when appropriate" the discretion to return a child to his or her place of habitual residence "if return would further the aims of the Convention." *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996)).

The Department of State Guidance states that "[t]his provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious."  Convention Analysis.

"[W]hile all jurists would agree that some level of domestic abuse will trigger the Article 13b exception, the more difficult question is at precisely what level will return expose the child to a  'grave risk of harm or place the child in an 'intolerable situation'?" *Simcox v. Simcox*, 511 F.3d 594,  605 (6th Cir. 2007). The Sixth Circuit stated that there is no clear answer, though it had favorably cited a State Department report that states, "The person opposing the child's return must show that the risk to the child is grave, not merely serious." *Id.* (citing *Friedrich*, 78 F.3d at 1068 (citing Public Notice 957, 51 Fed. Reg. 10494, 10510 (March 26, 1986)). The same report also noted that "[a]n example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child" because such circumstances would constitute "a grave risk of psychological harm." *Id. (quoting Friedrich*, 78 F.3d at 1069).

In this case the repeated neglect of L.M.G.R. by leaving her (and her deceased sister) unattended on various occasions constitutes physical and psychological abuse. L.M.G.R. still suffers panic attacks that she will be left alone. Likewise, placing an eight-year child in a situation where she was a care-giver to a baby constitutes physical and psychological abuse. L.M.G.R. described having to care for her baby sister while struggling to stay awake herself. She still feels a sense of guilt about her sister's death and expresses concern about her own mortality. In addition, Petitioner's exposure of L.M.G.R. to sexual activity has been repeated and not isolated. This is not an instance where return of the child to Germany would merely result in hardship or denial of certain educational or economic opportunities or not comport with the child's preference; rather this is a situation where according to a very experienced child psychologist the child faces a real risk of being hurt, physically or psychologically, if she is returned to her mother's living and working relationships. *See Blondin v. Dubois*, 238 F.3d 153 (2d Cir. 2001).

<u>Article 20</u>

This exception was intended to be narrowly applied and is not to be used "as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed." Department of State Guidance, 51 Fed. Reg. 10494. The "language of Article 20 has no known precedent in other international agreements to serve as a guide in its interpretation." Public Notice 957, 51 Fed. Reg. 10494, 10511 (March 26, 1986). "Consequently, so as to be able to refuse to return a child on the basis of this article, it will be necessary to show that the fundamental principles of the requested State concerning the subject-matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles. Secondly, such principles must not be invoked any more frequently, nor must their invocation be more readily admissible than they would be in their application to purely internal matters." *Id.*

### Conclusion

Pursuant to Article 13, Respondent has established by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Respondent has failed to establish that Article 20 is applicable.

Petitioner's verified petition for return of the child is DENIED. Respondent's motion for discovery (docket no. 11) is dismissed as moot.

It is so ORDERED.

SIGNED this 23rd day of April, 2013.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE